**E-FILED**
Monday, 15 September, 2005 10:19:56 AM
Clerk, U.S. District Court, ILCD

# United States Court of Appeals

## For the Seventh Circuit

### Chicago, Illinois 60604
**NOTICE OF ISSUANCE OF MANDATE**

DATE:   September 13, 2005

TO:   John M. Waters
United States District Court
Central District of Illinois
151 U.S. Courthouse
600 E. Monroe Street
United States Courthouse & Federal Building
Springfield, IL  62701

**FILED**

SEP 1 5 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

FROM:   Gino J. Agnello, Clerk

RE:   03-3818
Washington, Chrissie v. IL Dept Revenue
01 C 3300, Byron G. Cudmore, Magistrate Judge

Herewith is the mandate of this court in this appeal, along
with the Bill of Costs, if any.  A certified copy of the
opinion/order of the court and judgment, if any, and any
direction as to costs shall constitute the mandate.

[ ] No record filed
[X] Original record on appeal consisting of:

**ENCLOSED:**                           **TO BE RETURNED AT LATER DATE:**

| | | |
|---|---|---|
| [1] | Volumes of pleadings | [ ] |
| [1] | Volumes of loose pleadings | [ ] |
| [ ] | Volumes of transcripts | [ ] |
| [ ] | Volumes of exhibits | [ ] |
| [ ] | Volumes of depositions | [ ] |
| [ ] | In Camera material | [ ] |
| [ ] | Other_____ | [ ] |

Record being retained for use                [ ]
in Appeal No. _____

Copies of this notice sent to:          Counsel of record
[ ]      United States Marshal
[ ]      United States Probation Office

**NOTE TO COUNSEL:**
If any physical and large documentary exhibits have been filed in
the above-entitled cause, they are to be withdrawn ten days from the
date of this notice.  Exhibits not withdrawn during this period will
be disposed of.

Please acknowledge receipt of these documents on the enclosed copy
of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Received above mandate and record, if any, from the Clerk, U.S.
Court of Appeals for the Seventh Circuit.

Date: _____    _____
(1071-120397)                              Deputy Clerk, U.S. District Court

# United States Court of Appeals

## For the Seventh Circuit

## Chicago, Illinois 60604

### JUDGMENT - WITH ORAL ARGUMENT

CERTIFIED COPY

**Date: August 22, 2005**

**BEFORE:**        Honorable FRANK H. EASTERBROOK, Circuit Judge

Honorable ILANA DIAMOND ROVNER, Circuit Judge

Honorable DIANE S. SYKES, Circuit Judge

No. 03-3818

CHRISSIE WASHINGTON,
            Plaintiff - Appellant

    v.

ILLINOIS DEPARTMENT OF REVENUE,
            Defendant - Appellee

FILED

SEP 15 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Appeal from the United States District Court for the
Central District of Illinois
No. 01 C 3300, Byron G. Cudmore, Magistrate Judge

        The judgment of the District Court is REVERSED, with costs and the
case is REMANDED.   The above is in accordance with the decision of this
court entered on this date.

(1061-110393)



A True Copy:
    Teste:

    Clerk of the United States
    Court of Appeals for the

# CERTIFIED COPY

## In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 03-3818

CHRISSIE WASHINGTON,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF REVENUE,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 01-CV-3300—**Byron G. Cudmore,** *Magistrate Judge.*

---

ARGUED OCTOBER 26, 2004—DECIDED AUGUST 22, 2005

---

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Between 1984 and 2000, Chrissie Washington worked from 7 a.m. until 3 p.m. instead of the standard 9-to-5 schedule at the Illinois Department of Revenue. The earlier hours allowed her to care for her son, who has Down syndrome, when he arrived home. By 1995 Washington had been promoted to Executive Secretary I. Over the next few years some of her duties were reassigned to others. Believing that this was the result of race discrimination, she filed a formal charge with state and federal officials in June 1999. That charge, she maintains, led supervisors to rescind the flex-time schedule on which her son depended.

A senior manager demanded that she work from 9 to 5 and, when she refused, her position was abolished. She was assigned to another Executive Secretary I post with a different supervisor and required to apply anew for a flex-time schedule. When that accommodation was refused, she took vacation or sick leave each day from 3 p.m. to 5 p.m. until those benefits were exhausted. In August 2000 she took an unpaid leave of absence that lasted until January 2001, when she returned to work for a different supervisor who allowed her to work a 7-to-3 schedule. She contends in this suit under Title VII of the Civil Rights Act of 1964 that the agency moved her to a 9-to-5 schedule in retaliation for her earlier charge of discrimination. See 42 U.S.C. §2000e-3(a). The parties agreed to have a magistrate judge resolve their dispute. See 28 U.S.C. §636(c). He granted summary judgment for the agency because, he concluded, Washington had not established even a *prima facie* case of retaliation. She could not do so, the judge ruled, because a change of work hours, while salary and duties remain the same, is not an "adverse employment action." See *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). And without an "adverse employment action" there can be no violation of Title VII, the court concluded.

Washington wants us to hold that an "adverse employment action" is unnecessary in retaliation suits, though it is essential (she allows) in litigation asserting discrimination with respect to wages, hours, or conditions of employment. She relies on decisions saying that proof of an "adverse employment action" is unnecessary in litigation under §2000e-3(a), which deals with retaliation, because that section is "broader" than §2000e-2(a), which deals with discrimination in the terms and conditions of employment. See, e.g., *Firestine v. Parkview Health System, Inc.*, 388 F.3d 229, 235 (7th Cir. 2004); *Herrnreiter*

No. 03-3818                                                                                    3

*v. Chicago Housing Authority*, 315 F.3d 742, 745 (7th Cir. 2002). The employer relies on decisions of other panels saying that an "adverse employment action" is essential to both kinds of claims. See, e.g., *Hudson v. Chicago Transit Authority*, 375 F.3d 553, 559-61 (7th Cir. 2004); *Little v. Illinois Department of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004); *Stone v. Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002). Decisions of other circuits likewise can be aligned on each side. Compare *Passer v. American Chemical Society*, 935 F.2d 322, 331-32 (D.C. Cir. 1992) (plaintiff need not show an adverse change in pay or working conditions), with *Nelson v. Upsala College*, 51 F.3d 383, 388-89 (3d Cir. 1995), and *Bass v. Orange County*, 256 F.3d 1095, 1118 (11th Cir. 2001).

The supposed conflict among panels of this circuit is illusory (though the conflict among other circuits may be real). Retaliation may take the form of acts outside the workplace. The state's Department of Revenue might have audited Washington's tax returns in response to her complaint to the EEOC, or hired a private detective to search for a disreputable tidbit that could be used to intimidate her into withdrawing the complaint. When the employer's response does not affect a complainant's terms and conditions of employment, it is vain to look for an adverse "employment" decision.

Section 2000e-3(a) is "broader" than §2000e-2(a) in the sense that retaliation may take so many forms, while §2000e-2(a) is limited to discrimination "with respect to [the worker's] compensation, terms, conditions, or privileges of employment". This is why we said in *Herrnreiter* and similar decisions that retaliation need not entail an adverse employment action. 315 F.3d at 745-46. *Passer*, which Washington particularly likes, dealt with a claim that cancellation of a professional meeting was retaliatory; that's a good example of action that may inflict injury without changing pay or working conditions. But it does

not follow from the fact that retaliation may be found in events away from the employer's premises that every unwelcome response is forbidden retaliation. To explain why this is so, we start with the question why an "adverse employment action" ever matters, for that phrase is not in Title VII itself. It is a judicial gloss on the word "discrimination," and courts must take care not to confuse the gloss with the statute.

Title VII does not define "discrimination," the key term not only for §2000e-2(a) but also for §2000e-3(a), as the latter section treats retaliation as a form of discrimination. Lack of a definition leaves unresolved the question *how important* a difference must be to count as "discrimination." Suppose a supervisor regularly smiles or nods when a member of his own religious faith walks by, but does not change expression when an adherent of another faith passes through the office. Does this difference in treatment violate Title VII's prohibition on religious discrimination? Courts have resisted the idea that federal law regulates matters of attitude or other small affairs of daily life—not just because of the maxim *de minimis non curat lex* (the law does not bother with trifles), see *Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992), but because almost every worker feels offended or aggrieved by many things that happen in the workplace, and sorting out which of these occurred because of race, sex, religion, national origin, or a complaint about any of these would be an impossible task. Even in an all-white, all-male, labor force where all workers share one religious faith, everyone feels put upon or slighted occasionally; if these cannot be attributed to discrimination, neither can most of the other disappointments people encounter at work.

Thus the Supreme Court has held that, although any "tangible employment action"—lower pay or another "significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits", *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)—may be treated as "discrimination," only a "severe or pervasive" change in the daily "conditions" of employment may be treated as discriminatory. See *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Congress *could* make any identifiable trifle actionable, but the undefined word "discrimination" does not itself command judges to supervise the minutiae of personnel management. Even the definition of "tangible employment action" in *Ellerth* uses "significant" three times, reminding us that life's little reverses are not causes of litigation.

These considerations underlie decisions such as *Williams* and *Grube*, which hold that a lateral transfer that does not affect pay (or significantly affect working conditions) cannot be called discriminatory. See also *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). Such changes may cause upset as workers must adjust their schedules but do not hurt the pocketbook. Many of our decisions restate. this as the principle that transfers normally are not "adverse employment actions." The Supreme Court likely would say that a transfer is a "tangible employment action" (it is an official decision by the employer) but that the change is not "significant." *Grube, Williams*, and *Smart* are the principal authorities on which the district court relied in ruling against Washington: she was moved from one Executive Secretary I position to another, without loss of pay or promotion opportunities.

Although the anti-retaliation rule in §2000e-3(a) is broader than the anti-discrimination rule in §2000e-2(a) in the sense that it extends beyond pay and other tangible

employment actions, nothing in §2000e-3(a) says or even
hints that the significance or materiality requirement has
been dispensed with. Retaliation is a *kind* of "discrimina-
tion" under Title VII, and the Supreme Court has treated
materiality or significance as integral to "discrimination"
rather than to anything that §2000e-2(a) has and §2000e-
3(a) lacks. *Spearman v. Ford Motor Co.*, 231 F.3d 1080,
1086 (7th Cir. 2000), and *Heuer v. Weil-McLain*, 203 F.3d
1021, 1023 (7th Cir. 2000), say, or at least assume, that
if the supposedly retaliatory acts occurred at work, the
court asks whether the employer's action is severe
enough to be an "adverse employment action." Likewise if
failure to smile at work would not be a form of discrimina-
tion (because not a severe or pervasive change in working
conditions), so too a failure to smile *after* work (say, when
the supervisor meets an employee at school or church)
could not be deemed discriminatory, and thus could not
be a form of forbidden retaliation.

The materiality requirement is built into the word
"discrimination" and thus *must* apply to the anti-retalia-
tion rule in §2000e-3(a), whether the supposedly retalia-
tory acts occur in or out of the workplace. Now "material"
is one of those protean words that resists further defini-
tion. This holds open some potential to say that an act
that would be immaterial in some situations is material
in others. For example, suppose that the employee's
charge of discrimination is designed to obtain a $10,000
annual raise. Moving that employee in response from a
100-square-foot cubicle to a 70-square-foot one, or to one
with a metal rather than a wooden desk, would not be a
material change in the conditions of employment, because
petty bureaucratic nastiness does not dissuade a reason-
able person from seeking a substantial increase in income.
If instead of seeking money for himself the employee
supported a colleague's charge of discrimination, however,
this sort of response might induce the employee to with-

hold support; it takes less to deter an altruistic act than to deter a self-interested one. As we remarked in *Herrnreiter*, 315 F.3d at 746, the sort of response deemed immaterial to self-interested charges could be material to others, and thus could be deemed discriminatory. But as in *Herrnreiter* it is unnecessary to pursue this possibility further; Washington's charge of discrimination was self-interested rather than altruistic, and though she did not file it to improve her financial lot she does not contend that this should matter.

To recapitulate: "discrimination" entails a requirement that the employer's challenged action would have been material to a reasonable employee, which means that the same requirement applies to §2000e-3(a), the anti-retaliation clause, as well as the other provisions in Title VII that use the word "discrimination." An employer's action is not material under §2000e-3(a) if it would not have dissuaded a reasonable worker from making or supporting a charge of discrimination. By and large a reassignment that does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable. But "by and large" differs from "never."

Suppose an employer knows that a particular worker has a nervous condition or hearing problem that makes him miserable when exposed to music for extended periods. Many people find music soothing and welcome its addition to the workplace. But if an employer sought to retaliate for a charge of discrimination by exploiting this vulnerability, moving him from a quiet office to one where Muzak plays constantly, that could be a material change if not, indeed, a constructive discharge, even under the high standard of *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). Catbert, the Evil Director of Human Resources in the comic strip *Dilbert*, delights in pouncing on employees' idiosyncratic vulnerabilities. Perverse cleverness that is funny when limited to news-

print readily could be seen as discrimination when used to discomfit real people.

This record suggests that the Illinois Department of Revenue may have a Catbert in its management, seeking out devices that would be harmless to most people but do real damage to select targets. What Washington alleges—that her job was abolished and that she was then placed in a "new" Executive Secretary I position—would for most people be no different from a change of supervisors, a step that would not be discriminatory under *Ellerth* and the Supreme Court's other decisions. But because Washington was assigned to a "new position" rather than just a new supervisor, she had to reapply for a flex-time schedule. The approval she had received in 1984 covered only her "old" position, and the Department insisted that she work a normal 9-to-5 schedule at her "new" job. What the Department effectively did, then, was assign her a new supervisor and change her hours. Again this would not be materially adverse for a normal employee—but Washington was *not* a normal employee, and Catbert knew it. She has a vulnerability: her son's medical condition. Working 9-to-5 was a materially adverse change *for her*, even though it would not have been for 99% of the staff. In practical effect the change cut her wages by 25%, because it induced her to use leave for two hours per day (her salary remained the same, but her vacation and sick leave drained away, which is an effective reduction in salary). When her leave ran out, her pay fell to zero for five months, until she found a supervisor willing to let her go at 3.

At this stage of the litigation a court must indulge all reasonable inferences in Washington's favor. A jury could find that the Department set out to exploit a known vulnerability and did so in a way that caused a significant (and hence an actionable) loss. To say this is not to say that Washington necessarily has a good claim. Perhaps

No. 03-3818                                                                    9

she responded unreasonably to the change in hours; if she had other options to care for her son without an (effective) reduction in pay, then the change in working hours would not be material. Or perhaps the Department may be able to show that it had a non-retaliatory justification. Suppose, for example, that little work was available for Washington to do during the hours of 7 to 9 a.m., before others arrived, and that the time between 9 a.m. and 3 p.m. (six hours less a lunch break) was not enough to handle the office's business, so that Washington left work for others to finish. That would be a nondiscriminatory reason for moving Washington to a different post and changing her schedule. Perhaps other considerations supported the change; or perhaps whoever was responsible did not know of Washington's family situation. (There is no statutory obligation to seek out idiosyncratic vulnerabilities and avoid taking steps that cause injury; §2000e-3(a) is not an accommodation requirement. See *Brown*, 199 F.3d at 457. An employer that is oblivious to the costs its decisions create cannot be using these costs to retaliate.) Assessment of these possibilities lies ahead. The district court's judgment is reversed, and the case is remanded for trial.

A true Copy:

    Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—8-22-05